AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 1-7-2022)

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| Information associated with One Target | ) | Case No.   MJ23-152 |
| Account/Identifier, for Investigation of 21 | ) | |
| U.S.C. § 841(a)(1) and Other Offenses | ) | |

## APPLICATION FOR A SEARCH WARRANT AND PEN-TRAP ORDER

I, a federal law enforcement officer or an attorney for the government, request a search warrant and pen-trap order, and state under penalty of perjury that I have reason to believe that on the person or property described in Attachment A, located in the Western District of Washington, there is now concealed property and evidence described in Attachment B. This Court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution and Possession with Intent to Distribute Controlled Substances |

The application is based on the facts set forth in the attached affidavit, which is incorporated herein by reference with all attachments and exhibits. Pursuant to 18 U.S.C. § 3123(a)(1), Exhibit 1 to the affidavit includes a certification from an attorney from the government that the requested information is relevant to an ongoing criminal investigation.

☒ Delayed notice of 90 days (give exact ending date if more than 30 days: August 18, 2023) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 41, this warrant is presented by:
☒ reliable electronic means; or ☐ telephonically recorded

_____
*Applicant's signature*

Jacob Molinar, Special Agent
*Printed name and title*

☐ The foregoing affidavit was sworn before me and signed in my presence, or
☒ The above-named officer provided a sworn statement attesting to the truth or the foregoing affidavit by telephone

Date: April 5, 2023

_____
*Judge's signature*

Michelle L. Peterson, United States Magistrate Judge
*Printed name and title*

City and state: Seattle, Washington

USAO # 2023R00328

1

2

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT AND PEN-TRAP ORDER

3

4     STATE OF WASHINGTON          )

5     COUNTY OF KING               )        ss
                                   )

6

7          I, JACOB MOLINAR, being first duly sworn, hereby depose and state as follows:

8                                 **INTRODUCTION**

9          1.     I make this affidavit in support of an application for a search warrant under

10    Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information

11    about the location of the cellular telephone assigned call number **(206) 636-3962**, with

12    International Mobile Subscriber Identity (IMSI) 310260185837220 with an unknown

13    listed subscriber name (the "**Target Cell Phone**"), whose service provider is T-Mobile, a

14    wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany New

15    Jersey, 7054.[1]  The **Target Cell Phone** is described herein and in Attachment A, and the

16    location information to be seized is described herein and in Attachment B.  The user of

17    the **Target Cell Phone** is suspected to be ALBARO LEMUS GONZALEZ (a/k/a

18    Benjamin Lemus Gonzalez).

19                                    ECPA

20         2.     The Court has jurisdiction to issue the proposed warrant under the

21    Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2701-2713, because it

22    is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the

23

24

25    ─────────────────

26    [1] On March 10, 2023, agents obtained results from a subpoena issued to T-Mobile containing the listed
      IMSI number for the **Target Cell Phone**.  Additionally, on April 12, 2022, agents obtained results from a
27    subpoena issued to T-Mobile containing the same listed IMSI number and indicating that the **Target Cell
      Phone** was a prepaid account with no known listed subscriber and a partial subscriber address of Bothell,
28    Washington 98011.

AFFIDAVIT OF SPECIAL AGENT JACOB MOLINAR - 1
USAO # 2023R00328

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Court is a district court of the United States that has jurisdiction over the offense being

2  investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

3  <u>Pen Register Act</u>

4      3.    Because this warrant seeks the prospective collection of information that

5  falls within the statutory definitions of information collected by a "pen register" and/or

6  "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed

7  to comply with the Pen Register Act, 18 U.S.C. §§ 3121-3127.

8      4.    The Court has jurisdiction to issue the requested pen-trap order because it is

9  a "court of competent jurisdiction" under 18 U.S.C. § 3122(a)(2).  Specifically, the Court

10  is a district court of the United States that "has jurisdiction over the offense being

11  investigated." 18 U.S.C. § 3127(2)(A)(i).

12      5.    This application includes all the information required by the Pen Register

13  Act.  *See* 18 U.S.C. §§ 3122(b) & 3123(a)(1).  Namely, Exhibit 1 to this application is a

14  certification from Special Assistant United States Attorney Jessica M. Ly that

15  (1) identifies the Drug Enforcement Administration as the law enforcement agency

16  conducting the investigation and (2) certifies the information likely to be obtained is

17  relevant to an ongoing criminal investigation being conducted by that agency.  18 U.S.C.

18  § 3122(b).  The Special Assistant United States Attorney is an "attorney for the

19  government" as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure.

20      6.    A "pen register" is "a device or process which records or decodes dialing,

21  routing, addressing, or signaling information transmitted by an instrument or facility from

22  which a wire or electronic communication is transmitted." 18 U.S.C. § 3127(3).  A "trap

23  and trace device" is "a device or process which captures the incoming electronic or other

24  impulses which identify the originating number or other dialing, routing, addressing, and

25  signaling information reasonably likely to identify the source of a wire or electronic

26  communication." 18 U.S.C. § 3127(4).

27      7.    In the traditional telephone context, pen registers captured the destination

28  phone numbers of outgoing calls, while trap and trace devices captured the phone

AFFIDAVIT OF SPECIAL AGENT JACOB MOLINAR - 2
USAO # 2023R00328

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   numbers of incoming calls.  Similar principles apply to other kinds of wire and electronic

2   communications such as emails, text messages, connection logs, and data transfers.  The

3   prospective location data sought in this application constitutes "dialing, routing,

4   addressing, and signaling information" covered by the Pen Register Act.  Accordingly,

5   the requested warrant will record, decode, and/or capture dialing, routing, addressing, and

6   signaling information associated with the **Target Cell Phone** without geographic limit.

7         8.    The United States further requests, pursuant to 18 U.S.C. §§ 3123(b)(2) and

8   3124(a)-(b), that the Court order through Attachment B of the requested warrant that T-

9   Mobile and any other person or entity providing wire or electronic communication

10  service in the United States whose assistance may facilitate execution of this warrant

11  furnish, upon service of the warrant, information, facilities, and technical assistance

12  necessary to install the pen/trap, including installation and operation of the pen-trap

13  unobtrusively and with minimum disruption of normal service.  Any entity providing

14  such assistance shall be reasonably compensated by the Drug Enforcement

15  Administration, pursuant to 18 U.S.C. § 3124(c), for reasonable expenses incurred in

16  providing facilities and assistance in furtherance of the warrant.

17        **9.**    **Through this application, the United States does not request and does**

18  **not seek to obtain the contents of any communications, as defined in 18 U.S.C.**

19  **§ 2510(8).**

20  **AGENT BACKGROUND**

21        10.    I am employed as a Special Agent with the United States Drug

22  Enforcement Administration ("DEA"), and have been so employed since March of 2021.

23  I am currently assigned to the Seattle Field Division.  In this capacity, I investigate

24  violations of the Controlled Substances Act, Title 21, United States Code, Section 801 *et*

25  *seq.*, and related offenses.  I have received specialized training in the enforcement and

26  investigation of the Controlled Substances Act.  I have received over 620 hours of

27  training, including, but not limited to, drug identification, drug interdiction, detection,

28  money laundering techniques and schemes, smuggling, and the investigation of

AFFIDAVIT OF SPECIAL AGENT JACOB MOLINAR - 3
USAO # 2023R00328

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

individuals and/or organizations involved in the illegal possession, possession for sale, sales, importation, smuggling, cultivation, manufacturing, and illicit trafficking of controlled substances.  In my role as a Special Agent, I have been involved in investigations of individuals who have smuggled, received, and distributed controlled substances, including heroin, fentanyl, cocaine, and methamphetamine, as well as the seizure of illegal narcotics and proceeds of the sale of those narcotics.  Furthermore, I am familiar with how drug traffickers conduct their business, including, but not limited to, their methods of importing and distributing drugs, their use of communication devices (cellular telephones, cellphone applications, etc.) to facilitate their illegal efforts, and their use of numerical codes and code words to conduct their illegal transactions.

11.     I have familiarized myself with various tactics, tools, methods, trends, paraphernalia, and related articles utilized by various narcotics traffickers in their efforts to import, export, conceal, and distribute controlled substances.  I am also familiar with the manner in which drug traffickers use telephones, often cellular telephones, to conduct their unlawful operations, and how they code their conversations to disguise their unlawful activities.  I am also fluent in Spanish, as it is my first language, and am familiar with various Spanish terms used in drug conversations.  This is an advantage when investigating narcotics traffickers who primarily speak and communicate among each other in Spanish.  I continue to refine my knowledge in the Spanish lingo used by drug traffickers based on the region they are from.

12.     I have participated in the debriefing of defendants, witnesses, and informants, during which time I have discussed with them their methods of drug smuggling, distribution, packaging, trafficking, avoiding law enforcement, and laundering proceeds, among other concerns related to drug trafficking.  I have discussed and learned from other law enforcement investigators regarding these matters as well.

13.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested

AFFIDAVIT OF SPECIAL AGENT JACOB MOLINAR - 4
USAO # 2023R00328

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   warrant and pen-trap, and therefore does not set forth all of my knowledge about this

2   matter.

3          14.     Based on the facts set forth in this affidavit, there is probable cause to

4   believe that violations of 21 U.S.C. § 841(a)(1) (Distribution and Possession with Intent

5   to Distribute Controlled Substances) are being committed and will be committed by

6   ALBARO LEMUS GONZALEZ (a/k/a Benjamin Lemus Gonzalez) and others.  There is

7   also probable cause to believe that the location information described in Attachment B

8   will constitute evidence of these criminal violations, and will lead to the identification of

9   individuals who are engaged in the commission of these offenses.

10   **PROBABLE CAUSE**

11          15.     The United States, including the Drug Enforcement Administration (the

12   "DEA"), is conducting a criminal investigation of ALBARO LEMUS GONZALEZ

13   (a/k/a Benjamin Lemus Gonzalez) (hereinafter, "LEMUS GONZALEZ") and

14   unidentified subjects regarding possible violations of 21 U.S.C. § 841(a)(1).

15   ***Summary of Investigation and Source Information***

16          16.     Confidential Source 1 ("CS1") is a paid DEA informant who is also

17   working for immigration considerations.  CS1 began working with the DEA in 2014.  To

18   my knowledge, CS1 has never given law enforcement false information, and the

19   information s/he has provided to me in the past has proved to be true and reliable.  CS1

20   has worked on previous investigations that led to charges and has successfully completed

21   multiple controlled buys in different investigations.  Prior to 2014, CS1 was convicted of

22   conspiracy to distribute cocaine, a felony.  Additionally, CS1 has a misdemeanor

23   conviction for reckless endangerment and was previously arrested for assault.  Assistance

24   provided by CS1 has led to the seizure of narcotics and U.S. Currency.

25          17.     In January of 2022, CS1 received a telephone number **(206) 636-3962** (the

26   **Target Cell Phone**) associated with a Western Washington-based poly-drug distributor

27   known by the moniker "El Michoacano" (believed to be in reference to the Mexican State

28

AFFIDAVIT OF SPECIAL AGENT JACOB MOLINAR - 5
USAO # 2023R00328

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Michoacan), and later identified as ALBARO LEMUS GONZALEZ.[2]  I believe LEMUS

2  GONZALEZ to be the sole or primary user of this telephone number around this time

3  period due to phone conversations showing apparent knowledge and awareness of

4  previous drug conversations between CS1 and LEMUS GONZALEZ.

5      18.     On February 15, 2022, agents from the DEA directed CS1 to contact

6  LEMUS GONZALEZ.  The following day, at the direction of agents, CS1 and LEMUS

7  GONZALEZ met at a restaurant located in Seattle, Washington.  According to CS1,

8  following a meal together, LEMUS GONZALEZ discussed various types of drugs,

9  quantities, and their respective prices.  LEMUS GONZALEZ explained to CS1 that the

10 price for "puerco/puercas"[3] (i.e., counterfeit M-30 tablets containing fentanyl) would

11 depend upon the quantity CS1 wanted to purchase.  LEMUS GONZALEZ further

12 explained that if CS1 were to purchase 1,000 pills, the price per pill would be $3.00 (U.S.

13 Dollars).  If CS1 wanted to buy more than 1,000 pills, the price per pill would decrease to

14 $2.70.  If CS1 were to buy 10,000 pills, the price per pill would be $2.50.  LEMUS

15 GONZALEZ then told CS1 that LEMUS GONZALEZ was selling "agua"[4]

16 (methamphetamine) and that the price of one pound would be $2,100.00.  However,

17 LEMUS GONZALEZ explained to CS1 that the price for methamphetamine would

18 decrease if CS1 were to purchase a larger quantity.  Following LEMUS GONZALEZ's

19 discussion of drug prices, LEMUS GONZALEZ and CS1 walked to LEMUS

20 GONZALEZ's vehicle.  At the vehicle, LEMUS GONZALEZ accessed the vehicle and

21 retrieved a toolbox, which CS1 observed to be positioned behind the driver's seat.

22 LEMUS GONZALEZ then opened the toolbox and revealed what CS1 suspected to be

23

24  _____

25 [2] Based upon LEMUS GONZALEZ's Washington State Driver's License, agents discovered LEMUS
   GONZALEZ also maintains a listed first name of 'Benjamin'.

26

27 [3] Translated to be "pigs".

28 [4] Translated to be "water".

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    one, uncut kilogram of methamphetamine and a second, cut kilogram of

2    methamphetamine packaged into multiple ounce level baggies.

3    *Recorded Phone Call Between CS1 and LEMUS GONZALEZ on March 7, 2022*

4        19.    On March 7, 2022, DEA agents met with CS1 and directed CS1 to make a

5    phone call to the **Target Cell Phone** while in the presence of agents.  The subsequent

6    conversation between CS1 and the user of the **Target Cell Phone**, believed to be

7    LEMUS GONZALEZ, was conducted entirely in Spanish; however, a fluent, Spanish-

8    speaking agent was present throughout the entirety of the phone conversation.[5]

9        20.    At the beginning of the conversation, CS1 and LEMUS GONZALEZ

10    discussed matters unrelated to drug trafficking.  However, moments later, CS1 asked

11    LEMUS GONZALEZ if CS1 could speak to drug-related matters, and LEMUS

12    GONZALEZ responded affirmatively.  CS1 stated, "OK.  Friend, the cassette [memory]

13    was erased on me.  How much did we agree on 'agua' [methamphetamine] for a 'liberta'[6]

14    [pound]"?  LEMUS GONZALEZ replied to CS1, "a 'Douglas' [$2,000 U.S. Dollars]".

15    CS1 repeated the term "Douglas" to confirm, to which LEMUS GONZALEZ replied,

16    "remember we had said 2,100 but left it at Douglas".[7]  CS1 then stated, "Ok Douglas, ok.

17    Now if I get you half [of a 'Douglas'], because right now I am a bit short [drug proceeds].

18    Is that ok with you?"  LEMUS GONZALEZ asked CS1 to repeat, and CS1 stated, "A

19    half of a 'liberta' [pound] how much would you put it at?  Since I know it's less".

20    LEMUS GONZALEZ told CS1 "to do the math", to which CS1 replied, "Oh, that good,

21

22

23    [5] I was present during this phone call and later translated the conversation from Spanish to English (or the
      best English equivalent).  Throughout the conversation, CS1 and LEMUS GONZALEZ used words

24    and/or phrases common among drug traffickers to conceal their activities.  Except for the drug-related
      Spanish words, the conversation excerpts in this affidavit reflect the English translation or its equivalent

25    based on my knowledge and experience as well as that of CS1.

26    [6] Translated to be "notebook".

27    [7] This statement refers to the drug-related conversation CS1 and LEMUS GONZALEZ had in-person at a
      restaurant in Seattle, WA (refer to the Summary of Investigation and Source Information, *supra*).

28

AFFIDAVIT OF SPECIAL AGENT JACOB MOLINAR - 7
USAO # 2023R00328

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

just like that?", and LEMUS GONZALEZ confirmed.  CS1 and LEMUS GONZALEZ then began to coordinate a date to conduct the drug transaction.  At the end of the conversation, LEMUS GONZALEZ told CS1 that he also had "puercos/puercas [counterfeit M-30 tablets containing fentanyl]" and that he had "5" tablets in his possession.  CS1 replied, "Right on, and you were also going to give me some 'botones'[8] [counterfeit M-30 tablets containing fentanyl] examples?", to which LEMUS GONZALEZ stated, "that is what I'm talking about [in reference to the aforementioned 'puercos/puercas']".  CS1 confirmed and told LEMUS GONZALEZ that s/he would contact him at a later date.

### Previous Search Warrant and Pen-Trap Authorization

21.     On April 20, 2022, the Honorable Brian A. Tsuchida, United States Magistrate Judge, granted an application to collect subscriber records, pen-trap data, cell site data, and prospective E-911/GPS location data of wire and electronic communications of the **Target Cell Phone**.  Collection was authorized for a period of 30 days and was terminated on May 19, 2022.[9]

22.     On May 25, 2022, the Honorable S. Kate Vaughn, United States Magistrate Judge, granted an application to collect subscriber records, pen-trap data, cell site data, and prospective E-911/GPS location data of wire and electronic communications of the **Target Cell Phone**.  Collection was authorized for a period of 45 days and was terminated on July 9, 2022.[10]

### Controlled Purchase Conducted on April 20, 2022

23.     On April 20, 2022, DEA agents met with CS1 and directed CS1 to make a phone call to the **Target Cell Phone** while in the presence of agents.  CS1 attempted to

---

[8] Translated to be "buttons".

[9] Up until this date, pen and location data collected indicated that LEMUS GONZALEZ continued to use the **Target Cell Phone**.

[10] Up until this date, pen and location data collected indicated that LEMUS GONZALEZ continued to use the **Target Cell Phone**.

AFFIDAVIT OF SPECIAL AGENT JACOB MOLINAR - 8
USAO # 2023R00328

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

coordinate a meeting with LEMUS GONZALEZ by sending text messages to the **Target Cell Phone**.  CS1 and LEMUS GONZALEZ subsequently agreed to meet at the Target parking lot located at 13950 NE 178th Pl Ste. 100, Woodinville, WA.

24.    At 3:30PM that same day, investigators established surveillance in the vicinity of the above referenced Target parking lot in Woodinville, Washington.  CS1 met with investigators at a predetermined location prior to meeting with LEMUS GONZALEZ.  At 3:48PM, agents directed CSl to contact LEMUS GONZALEZ via text message to the **Target Cell Phone** to confirm the meeting time, and LEMUS GONZALEZ responded that he would be arriving in approximately five minutes.

25.    At 3:55PM, agents directed CSl to park in a certain section of the above referenced Woodinville location.  At 4:04PM, investigators observed LEMUS GONZALEZ entering CS1's vehicle.  Shortly afterwards, investigators observed LEMUS GONZALEZ exiting CS1's vehicle.  In a subsequent debrief with law enforcement, CS1 confirmed that s/he successfully purchased approximately one pound of suspected methamphetamine for $2,000.

26.    On April 21, 2022, agents field tested the suspected narcotics CS1 purchased using a Mass Spectrometer device (MX-908).  The presumptive field test indicated the narcotics were methamphetamine.

### Controlled Purchase Conducted on May 26, 2022

27.    On May 26, 2022, agents directed CS1 to contact LEMUS GONZALEZ via text message to the **Target Cell Phone.**  LEMUS GONZALEZ informed CS1 via text message that he (LEMUS GONZALEZ) was available to meet with CS1 later that day, around 6:00PM at "the same place as last time".  Agents believe that "the same place" refers to the location where LEMUS GONZALEZ sold approximately one pound of methamphetamine to CS1 on April 20, 2022.  CS1 continued to communicate with the **Target Cell Phone** via text messages to coordinate and confirm the details of their meeting.

AFFIDAVIT OF SPECIAL AGENT JACOB MOLINAR - 9
USAO # 2023R00328

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

28.     At approximately 4:15PM on May 26, 2022, investigators established surveillance in the Ross parking lot located in 17957 Garden Way NE, Suite C, Woodinville, WA.  Agents directed CS1 to park within this same parking lot in anticipation of the expected meeting with LEMUS GONZALEZ.

29.     At approximately 6:20PM that same day, agents observed LEMUS GONZALEZ entering CS1's vehicle.  In a subsequent debrief with law enforcement, CS1 confirmed s/he successfully purchased approximately one pound of suspected methamphetamine for $2,000.

30.     On May 27, 2022, agents field tested the suspected narcotics CS1 purchased using a Mass Spectrometer device (MX-908).  The presumptive field test indicated the narcotics were methamphetamine.

### Controlled Purchase on July 6, 2022

31.     At approximately 3:02PM on July 6, 2022, under the direction of agents, CS1 sent a text message to LEMUS GONZALEZ at the **Target Cell Phone** to coordinate a purchase of one-and-a-half pounds of methamphetamine.  CS1 and LEMUS GONZALEZ agreed to meet later that day at the same place as the May 26, 2022 transaction (i.e., the above referenced Ross parking lot in Woodinville, WA).

32.     At approximately 4:01PM on July 6, 2022, surveillance was established in the vicinity of the meeting location.  At approximately 4:38PM, investigators observed a vehicle known to be used by LEMUS GONZALEZ (a silver 2004 Chevy Silverado with Washington license plates C69857V; hereinafter, the "Silverado") park within the Ross parking lot.  At approximately 4:46PM, investigators observed another vehicle (a 2006 Blue Dodge Ram 1500 pickup truck with Washington license plates C04496X; hereinafter, the "Dodge") park immediately to the right of the Silverado.  Using digital surveillance, investigators observed: (i) LEMUS GONZALEZ exiting the Silverado from the driver's side door, holding a rectangular box and walking towards the front passenger side of the Dodge; and (ii) the Dodge's front passenger door opening.  Although the investigators' view was partially blocked by another vehicle in the parking lot,

AFFIDAVIT OF SPECIAL AGENT JACOB MOLINAR - 10
USAO # 2023R00328

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

investigators believe that LEMUS GONZALEZ entered the Dodge through its front passenger door.

33.    Shortly afterwards, investigators observed LEMUS GONZALEZ walking away from the Dodge's front passenger door and towards CS1's vehicle.  Investigators further observed LEMUS GONZALEZ entering the front passenger door of CS1's vehicle.

34.    At approximately 5:10PM, LEMUS GONZALEZ exited CS1's vehicle and walked back to the Dodge.  Investigators then observed LEMUS GONZALEZ entering the Dodge through its front passenger door and the male driver of the Dodge re-entering the vehicle through the driver's side door.

35.    In a subsequent debrief with law enforcement, CS1 confirmed s/he successfully purchased approximately one pound (not one-and-a-half pounds) of suspected methamphetamine for $2,000.

36.    On July 7, 2022, agents field tested the suspected narcotics CS1 purchased using a Mass Spectrometer device (MX-908).  The presumptive field test indicated the narcotics were methamphetamine

***Communication between LEMUS GONZALEZ and CS1 on March 9, 2023***

37.    Between approximately September 13, 2022 to March 9, 2023, no communication between CS1 and LEMUS GONZALEZ occurred.  Law enforcement suspects this may be due to the federal prosecution initiated in August 2022 of a separate individual who supplied LEMUS GONZALEZ with narcotics.[11]

38.    On March 9, 2023, at 9:47PM, CS1 received a text message from the **Target Cell Phone**, stating, "how are you relative?" (English translation).  Although CS1 recognized the phone number, CS1 pretended s/he did not know the sender and sent a text message asking for the user's identity.  The **Target Cell Phone** responded to CS1 with

---

[11] *See* CR22-00113-RSM.

two text messages at 10:19AM, stating, "Son El camarada q veias en la roos de Woodville", and "Y en la Target".  I understand these messages to mean: (i) "I am the comrade who you used to see at Ross in Woodinville" and (ii) "and at the Target".[12]

39.     Later that same day, at 4:45PM, the **Target Cell Phone** then sent CS1 a voice message.  Both I and CS1 recognize the voice in the recording to be the same voice as heard in the previously described March 7, 2022 phone call between CS1 and LEMUS GONZALEZ.  After listening to the voice recording in the presence of CS1, I discussed the contents of the recording with him/her.  The following is a summary of the recording based on CS1's knowledge of slang terms commonly used in Spanish conversations, including drug conversations.

40.     According to CS1, LEMUS GONZALEZ began the voice recording by greeting CS1 and requesting to meet CS1 the following day ("… si hay por ahi algodoncillo, como ve, como se siente pa manana…").  CS1 understood this to mean that LEMUS GONZALEZ wanted to sell CS1 narcotics soon.  LEMUS GONZALEZ then indicated that there was no work out there[13] and that he needed to make money for food ("No hay casi jale ni la verga pos hay que sacar para la papa").  LEMUS GONZALEZ then brought up the amount he and CS1 previously agreed to for one pound of methamphetamine ("Se acuerda que se las daba a douglas[14]?", which translates to: "Remember I was giving them to you at douglas?").  LEMUS GONZALEZ then stated, "not now, now one-eight, what do you think, another two-hundred less" (Ahora no, ahora sea uno ocho, como ve otros docientos menos"), which CS1 understood to mean $1,800

---

[12] There are some misspellings in the Spanish text messages sent from the **Target Cell Phone**, but it is clear to me as a Spanish speaker that these are the closest translations (if not the English equivalent) to what the texts meant.

[13] CS1 explained to me that there is currently little construction work available, and that LEMUS GONZALEZ was indicating that he is trying to find other means of income.

[14] "Douglas" (meaning $2,000) was the same term used during the previously detailed March 7, 2022 recorded call between CS1 and the **Target Cell Phone**.

1  instead of $2,000.  LEMUS GONZALEZ followed up by stating, "So I can win two-
2  hundred dollars" ("Para ya ganarme unos pinches 200 … bollias"), which I understand to
3  refer to the amount LEMUS GONZALEZ intended to make for the drug transaction.

4      41.    During the same voice recording, LEMUS GONZALEZ also referenced
5  "puerquitos", which is similar to the term he used in the previously detailed March 7,
6  2022 conversation between him and CS1 ("puercos/puercas", i.e., counterfeit M-30
7  tablets containing fentanyl).  LEMUS GONZALEZ indicated that he wanted to provide
8  CS1 with three of these pills and then they could discuss prices for those pills ("…quiero
9  llevarle botillo para que las vea y ahi hablamos del pinchi numerio no").  According to
10  CS1, during previous calls and controlled purchases, LEMUS GONZALEZ had told CS1
11  that LEMUS GONZALEZ would provide CS1 with samples of these pills.

12      42.    Based upon the information provided, the recorded conversation, and the
13  context within which they occurred, I believe that LEMUS GONZALEZ is continuing to
14  use the **Target Cell Phone** to facilitate drug trafficking.  Based upon my training and
15  experience, as well as my discussions with CS1, I know that the term "puerquitos" refers
16  to a certain type of narcotics (counterfeit M-30 tablets containing fentanyl) and that
17  "Douglas" refers to a specific drug price ($2,000).  I believe that when LEMUS
18  GONZALEZ told CS1, "Remember I was giving them to you at douglas?", LEMUS
19  GONZALEZ was referencing a prior drug-related conversation between CS1 and
20  LEMUS GONZALEZ that occurred on March 7, 2022, during which LEMUS
21  GONZALEZ talked about the quantities and prices of drugs.  To date, CS1 has only
22  purchased approximately pound-level quantities of suspected methamphetamine from
23  LEMUS GONZALEZ and this amount was always priced at $2,000 per pound.  I further
24  believe that, at the end of the voice message, when LEMUS GONZALEZ stated that he
25  was planning on providing "botillo" to CS1, LEMUS GONZALEZ was specifically
26  referencing counterfeit M-30 tablets containing fentanyl.  CS1 explained to me that
27  "botillo" is another word for "boton" (which I know due to my training and experience is
28  a term commonly used to refer to counterfeit M-30 pills containing fentanyl).

AFFIDAVIT OF SPECIAL AGENT JACOB MOLINAR - 13
USAO # 2023R00328

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*Controlled Purchase Conducted on March 16, 2023*

43.     On March 16, 2023, under the direction of investigators, CS1 communicated with LEMUS GONZALEZ through the **Target Cell Phone** to schedule a purchase of approximately one pound of methamphetamine in the vicinity of the Ross parking lot in Woodinville (the same area where the previous three controlled purchases were conducted).  Investigators were able to locate and follow LEMUS GONZALEZ around Kenmore and Woodinville up until the meeting with CS1.

44.     At approximately 5:51PM that day, CS1 arrived at the above referenced Ross parking lot.  Another individual (driving a Gray 2009 Honda Civic vehicle) drove LEMUS GONZALEZ to the meeting point, and they arrived at approximately 6:00PM. At approximately 6:10PM, LEMUS GONZALEZ exited the Honda Civic and entered CS1's vehicle.  CS1 and LEMUS GONZALEZ spoke for approximately 21 minutes.  LEMUS GONZALEZ then exited CS1's vehicle, walked, and entered a Ford F-150 vehicle which was parked in the same shopping center parking lot.

45.     Shortly afterwards, LEMUS GONZALEZ exited the Ford F-150 holding a black object in his hand and re-entered CS1's vehicle.  LEMUS GONZALEZ subsequently exited CS1's vehicle and re-entered the Honda Civic.

46.     Investigators met with CS1 later that same day at a predetermined location and took custody of approximately one pound of the suspected methamphetamine LEMUS GONZALEZ sold to CS1 for $1,900, as well three blue M30 pills LEMUS GONZALEZ provided CS1 as samples.  CS1 informed investigators that the black object LEMUS GONZALEZ carried from the Ford F-150 was a black plastic case that held the narcotics.

47.     Also on March 16, 2023, investigators field tested the suspected narcotics CS1 purchased using a Mass Spectrometer device (MX-908).  The presumptive field test indicated the narcotics were methamphetamine.

AFFIDAVIT OF SPECIAL AGENT JACOB MOLINAR - 14
USAO # 2023R00328

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

48.     Based on the demonstrated use of the **Target Cell Phone** to facilitate drug trafficking, I believe that the collection of location information for the next 45 days will allow law enforcement to track LEMUS GONZALEZ's movements and help to identify his associates and customers.

49.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers -- as transmitted from a cellular device to a cellular antenna or tower -- can be recorded by pen-traps and indicate the identity of the cellular device making the communication without revealing the communication's content.  Currently, the **Target Cell Phone** has IMSI 310260185837220.

50.     Based on my training and experience, I know that when a cell phone connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower, and the cellular antenna or tower records those identifiers as a matter of course.  The unique identifiers -- as transmitted from a cell phone to a cellular antenna or tower -- are like the telephone number of an incoming call.  They can be recorded by pen-trap devices and indicate the identity of the cell phone device making the communication without revealing the communication's content.  In addition, a list of incoming and outgoing telephone numbers is generated when a cell phone is used to make or receive calls, or to send or receive text messages (which may include photographs, videos, and other data).  These telephone numbers can be recorded by pen-trap devices and then used to identify the parties to a communication without revealing the communication's contents.

AFFIDAVIT OF SPECIAL AGENT JACOB MOLINAR - 15
USAO # 2023R00328

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

51.     Based on my training and experience, I know that a cell phone can also be used to exchange text messages with email accounts.  The email addresses associated with those text messages can be recorded by pen-trap devices and then used to identify parties to a communication without revealing the communication's contents.

52.     Based on my training and experience, I know that cellular phones can connect to the internet via a cellular network.  When connecting through a cellular network, internet communications sent and received by the cellular phone each contain the same unique identifier that identifies cellular voice communications, such as an ESN, MEIN, MIN, SIM, IMSI, MSISDN, or IMEI.  Internet communications from a cellular phone also contain the IP address associated with that cellular phone at the time of the communication.  Each of these unique identifiers can be used to identify parties to a communication without revealing the communication's contents.

53.     In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public.  I also know that certain providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data (also known as GPS data or latitude-longitude data) and cell-site data (also known as "tower/face information" or cell tower/sector records).  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the cell towers (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise than E-911 Phase II data.

AFFIDAVIT OF SPECIAL AGENT JACOB MOLINAR - 16
USAO # 2023R00328

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

54.     Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the **Target Cell Phone**, including by initiating a signal to determine the location of the **Target Cell Phone** on T-Mobile's network or with such other reference points as may be reasonably available.

55.     When using a cellular connection to receive or transmit data, a cellular phone typically utilizes a cell tower to make telephone calls, send or receive text messages, send or receive emails, surf the internet, and carry out application initiated data transfers, among other things.

56.     Based on my training and experience, I know that T-Mobile can collect cell-site data about the **Target Cell Phone**.  Based on my training and experience, I know that for each communication (including data connections) a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication.  I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

57.     Different service providers use different systems, applications, and reports to collect or analyze cell site data.  These systems, applications, and reports are referred to by a variety of names including, but not limited to real-time tool or "RTT" (Verizon), Periodic Location Updates or "PLU" (Verizon), per call measurement data or "PCMD" (Sprint), Location Database of Record or "LOCDBOR" (AT&T), EVDO, ALULTE, Timing Advance and True Call (T-Mobile/Sprint/US Cellular/GCI).   RTT data, for example, estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower.  This

AFFIDAVIT OF SPECIAL AGENT JACOB MOLINAR - 17
USAO # 2023R00328

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  information can be used to estimate an approximate location range that is more precise
2  than typical cell-site data.

3      58.     Based on my training and experience, I know that wireless providers such
4  as T-Mobile typically collect and retain information about their subscribers in their
5  normal course of business.  This information can include basic personal information
6  about the subscriber, such as name and address, and the method(s) of payment (such as
7  credit card account number) provided by the subscriber to pay for wireless
8  communication service.  I also know that wireless providers such as T-Mobile typically
9  collect and retain information about their subscribers' use of the wireless service, such as
10 records about calls or other communications sent or received by a particular device and
11 other transactional records, in their normal course of business.  In my training and
12 experience, this information may constitute evidence of the crimes under investigation
13 because the information can be used to identify the **Target Cell Phone**'s user or users
14 and may assist in the identification of co-conspirators and/or victims.

15     59.     Modern cell phones allow users to switch their telephone numbers, use
16 multiple telephone numbers on a single device, and transfer their telephone number to a
17 different cell phone.  These changes can be made with the assistance of the wireless
18 provider or by taking actions such as changing the "SIM card" (short for "subscriber
19 identity module card") of a cellphone.  To provide for any such changes made to the
20 **Target Cell Phone**, Attachment A specifies that the property to be searched includes:
21 (i) any instrument to which the listed target telephone number was assigned within the
22 last 30 days, and that now has been assigned a changed telephone number, (ii) any
23 changed telephone number assigned to an instrument now bearing the same unique
24 identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number
25 listed above, or that was bearing the same unique identifying number as the telephone
26 number listed above, at any point within the last 30 days, (iii) any changed unique
27 identifying number subsequently assigned to the same telephone number, or (iv) any
28 additional changed telephone number and/or unique identifying number, whether the

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  changes occur consecutively or simultaneously, listed to the same subscriber and wireless

2  telephone account number as the telephone numbers listed above, within the period of

3  disclosure authorized by this warrant.

4  **AUTHORIZATION REQUEST**

5  60.    Based on the foregoing, I request that the Court issue the proposed search

6  warrant and pen-trap order, pursuant to Federal Rule of Criminal Procedure 41, 18 U.S.C.

7  § 2703(c), and 18 U.S.C. § 3123.

8  61.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of

9  Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to

10  delay notice to the subscriber or user of the **Target Cell Phone** until 90 days after the

11  collection authorized by the warrant has been completed.  There is reasonable cause to

12  believe that providing immediate notification of the warrant may have an adverse result,

13  as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of

14  the **Target Cell Phone** would seriously jeopardize the ongoing investigation, as such a

15  disclosure would give that person an opportunity to destroy evidence, change patterns of

16  behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).

17  As further specified in Attachment B, which is incorporated into the warrant, the

18  proposed search warrant does not authorize the seizure of any tangible property.  *See* 18

19  U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of

20  any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire

21  or electronic information, there is reasonable necessity for the seizure for the reasons set

22  forth above.  *See* 18 U.S.C. § 3103a(b)(2).

23  62.    I further request that the Court direct T-Mobile to disclose to the

24  government any information described in Attachment B that is within the possession,

25  custody, or control of T-Mobile.  I also request that the Court direct T-Mobile to furnish

26  the government all information, facilities, and technical assistance necessary to

27  accomplish the collection of the information described in Attachment B unobtrusively

28  and with a minimum of interference with T-Mobile's services, including by initiating a

AFFIDAVIT OF SPECIAL AGENT JACOB MOLINAR - 19
USAO # 2023R00328

1  signal to determine the location of the **Target Cell Phone** on T-Mobile's network or with

2  such other reference points as may be reasonably available, and at such intervals and

3  times directed by the government.  The agency shall reasonably compensate T-Mobile for

4  reasonable expenses incurred in furnishing such facilities or assistance.

5      63.    Pursuant to 18 U.S.C. § 2703(g), the government will execute this warrant

6  by serving the warrant on T-Mobile.  Because the warrant will be served on T-Mobile,

7  who will then compile the requested records and data, reasonable cause exists to permit

8  the execution of the requested warrant at any time in the day or night.  I therefore request

9  that the Court authorize execution of the warrant at any time of day or night, owing to the

10  potential need to locate the **Target Cell Phone** outside of daytime hours.

11

12

13                                    JACOB MOLINAR, Affiant

14                                    Special Agent
                                  Drug Enforcement Administration

15

16      The above-named agent provided a sworn statement to the truth of the foregoing

17  affidavit by telephone on April 5, 2023.

18

19

20                                    HON. MICHELLE L. PETERSON

21                                    United States Magistrate Judge

22

23

24

25

26

27

28

AFFIDAVIT OF SPECIAL AGENT JACOB MOLINAR - 20
USAO # 2023R00328

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

**EXHIBIT 1**

2

3

<u>DECLARATION</u>

4

I, Jessica M. Ly, declare as follows:

5

1.      I am a duly appointed Special Assistant United States Attorney for the

6

Western District of Washington, and I have primary responsibility for representing the

7

interests of the United States herein.

8

2.      I make this declaration in support of an application for a search warrant

9

pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) with

10

an integrated pen-trap order pursuant to 18 U.S.C. §§ 3122 and 3123.

11

3.      Pursuant to 18 U.S.C. § 3122(b), I certify that the Drug Enforcement

12

Administration is the law enforcement agency conducting the investigation in this matter

13

and that the information likely to be obtained from the requested warrant is relevant to an

14

ongoing criminal investigation being conducted by that agency.

15

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

16

Application is made on the basis of information officially furnished, and on that basis I

17

verily believe such information to be true.

18

Executed this 4th day of April, 2023.

19

JESSICA LY (Affiliate)   Digitally signed by JESSICA LY (Affiliate)
Date: 2023.04.04 12:45:12 -07'00'

20

JESSICA M. LY

21

Special Assistant United States Attorney

22

23

24

25

26

27

28

Exhibit 1 - Declaration -- PAGE 1
USAO # 2023R00328

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970